UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GARFIELD PATTERSON. | No. 3:21-cr-103 (VAB) |

**RULING AND ORDER ON MOTION TO DISMISS**

Garfield Patterson is charged with reentry by a noncitizen who was previously removed from the United States, in violation of 8 U.S.C. § 1326. Indictment, ECF No. 1.

Mr. Patterson has filed a motion to dismiss the indictment on the ground that § 1326 is unconstitutional under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). Def.'s Mot. to Dismiss the Indictment, ECF No. 42 ("Mot.").

For the following reasons, Mr. Patterson's motion to dismiss is **DENIED**.

**I.   FACTUAL AND PROCEDURAL BACKGROUND**

According to the allegations of the indictment, Mr. Patterson is a noncitizen who was convicted in February 2000 in Florida state court of cannabis trafficking and possession of an unlawfully issued driver's license. Indictment. Following these convictions, Mr. Patterson was allegedly deported to Jamaica. *Id.* Having previously been removed from the United States, Mr. Patterson was allegedly present in Middletown, Connecticut, in June 2019 without having first obtained the express consent of the Attorney General or the Secretary of the Department of Homeland Security to reapply for admission into the United States. *Id.*

On June 15, 2021, a grand jury returned an indictment charging Mr. Patterson with one count of violating 8 U.S.C. § 1326(a) and (b)(1). *Id.*

On June 23, 2022, Mr. Patterson filed a motion to dismiss the indictment. Mot.

1

On October 12, 2022, the Government filed an opposition to Mr. Patterson's motion. Government's Mem. of Law in Opp'n to Def.'s Mot. to Dismiss the Indictment, ECF No. 57 ("Opp'n").

On October 27, 2022, Mr. Patterson filed a reply in support of his motion. Def.'s Reply to Government's Opp'n, ECF No. 84 ("Reply").

## II.     STANDARD OF REVIEW

Federal Rule of Criminal Procedure 12(b) permits defendants to raise by pretrial motion "any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1); *United States v. Sampson*, 898 F.3d 270, 278–79 (2d Cir. 2018). "In ruling on a motion to dismiss, a court views the indictment as a whole and assumes its factual allegations to be true." *United States v. Litvak*, No. 3:13-cr-19 (JCH), 2013 WL 5740891, at *2 (D. Conn. Oct. 21, 2013) (citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952)).

"[A] federal indictment can be challenged on the ground that it fails to allege a crime within the terms of the applicable statute," *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012), and thus may be decided "solely upon issues of law," *United States v. Was*, 684 F. Supp. 350, 351 (D. Conn. 1988), *aff'd*, 869 F.2d 34 (2d Cir. 1989). A court must dismiss an indictment that fails to state an offense. *See United States v. Pirro*, 212 F.3d 86, 92–93 (2d Cir. 2000); Fed. R. Crim. P. 12(b)(3)(B)(v). "But when such [an argument] raises dispositive evidentiary questions, a district court must defer resolving those questions until trial." *Sampson*, 898 F.3d at 279 (internal quotation marks omitted).

### III. DISCUSSION

Subject to limited exceptions, § 1326 provides that any noncitizen who "has been denied admission, excluded, deported, or removed" from the United States and thereafter "enters, attempts to enter, or is at any time found in, the United States," is subject to criminal penalties. 8 U.S.C. § 1326(a). Section 1326 was enacted as part of the Immigration and Nationality Act of 1952 ("INA"). Act of June 27, 1952, Pub. L. No. 82-414, § 276, 66 Stat. 163, 229. The statutory language included in the INA was based on a similar illegal reentry provision that was enacted in 1929 as part of the Undesirable Aliens Act ("UAA") and then repealed by the INA. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551, 1551; 66 Stat. at 279 (repealing the UAA).

Mr. Patterson contends that the charge against him in this case must be dismissed because § 1326 was enacted for a racially discriminatory reason that violates the Fifth Amendment to the United States Constitution. He argues, under the analysis set forth by the Supreme Court in *Arlington Heights*, that Congress was motivated in part by a discriminatory purpose in enacting §1326 and that the statute has a disparate impact on Black noncitizens (and non-white noncitizens generally). Mot. at 2.

#### A. The Applicable Legal Standard

Mr. Patterson argues that the *Arlington Heights* standard applies instead of the rational basis scrutiny that usually applies to immigration statutes because (1) he alleges discrimination based on race rather than alienage; and (2) noncitizens already within the United States are entitled to greater protections than those at the border or outside the country. *Id.* at 7. He also contends that the judicial deference typically afforded to decisions by Congress and the Executive Branch regarding the admission of noncitizens does not apply to criminal statutes. Reply at 1–2.

3

The Government argues that the Court should apply rational basis scrutiny in light of Congress's plenary power over immigration. Opp'n at 7. Alternatively, the Government contends that the Court is not required to decide this issue because, even if *Arlington Heights* applies, Mr. Patterson has not proved that § 1326 was enacted based on a discriminatory motive or that it has a disparate impact. *Id.* at 6.

The Court agrees with the Government that it "need not address the parties' disagreement concerning the applicable standard of review" because Mr. Patterson's challenge to § 1326 "fails under the more demanding standard of *Arlington Heights*." *United States v. Maldonado-Guzman*, No. 21-cr-448 (CM), 2022 WL 2704036, at *1 (S.D.N.Y. July 12, 2022) (rejecting a nearly identical challenge).

### B. The *Arlington Heights* Challenge

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. The Supreme Court has held that "the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239 (1976). Section 1326 does not on its face discriminate based on race. But even when a statute is facially neutral, it may violate the Fifth Amendment's equal protection component if it was enacted with a discriminatory purpose. *Arlington Heights*, 429 U.S. at 265–66.

Because statutes are rarely motivated by a single concern and legislators are "properly concerned with balancing numerous competing considerations," courts will generally "refrain from reviewing the merits of their decisions." *Id.* But when a plaintiff comes forward with "proof

4

that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Id.* at 265–66.

In determining whether an invidious discriminatory purpose was a motivating factor, the disparate impact of a statute—"whether it 'bears more heavily on one race than another'"—may provide an "important starting point." *Id.* at 266 (quoting *Washington v. Davis*, 426 U.S. at 242). In most cases, however, "impact alone is not determinative, and the Court must look to other evidence." *Id.* at 266.

Other categories of evidence that courts must consider include the "historical background" of the statute; the "specific sequence of events" leading up to its enactment; any "[d]epartures from the normal procedural sequence" or substantive departures from "the factors usually considered important by the decisionmaker"; and the legislative history. *Id.* at 267.

If the plaintiff shows that an official action was "motivated in part by a racially discriminatory purpose," the burden shifts to the Government to establish "that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21.

Mr. Patterson begins with the 1929 Undesirable Aliens Act, arguing that it had a disparate impact on non-white immigrants and was motivated at least in part by a discriminatory purpose under the factors set forth in *Arlington Heights*. Mot. at 8. He further contends that the illegal reentry provision's subsequent reenactment in 1952 did not cure or erase the discriminatory intent underlying the 1929 Act. *Id.* at 22. Instead, he argues that the Supreme Court's recent decisions in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), and *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), "confirm that a discriminatory purpose that fueled a law's original enactment remains relevant in determining its constitutionality." Mot. at 23.

In addition to this historical context, Mr. Patterson argues that contemporary evidence shows that the 1952 enactment of § 1326 was tainted by discriminatory motives. He relies primarily on the legislative history, including a 1950 report issued by the Senate Judiciary Committee comprehensively reviewing the U.S. immigration and naturalization system, *id.* at 25; a statement by President Truman accompanying his veto of the 1952 law, *id.* at 26–27; a letter written by Deputy Attorney General Peyton Ford in support of the bill that uses the racial slur "wetback," *id.* at 28; a criminal harboring bill, referred to by members of Congress as the "Wetback Bill," that was passed several months before the INA, *id.* at 31–32; and the general context of white supremacy in America in 1952, *id.* at 34.

Mr. Patterson concludes that this evidence establishes that § 1326 was enacted, at least in part, based on discriminatory motives, and that the burden shifts to the Government to prove that it would have been enacted even without such motives. *Id.* at 39. Alternatively, Mr. Patterson asks the Court to hold an evidentiary hearing to determine whether the *Arlington Heights* standard is met. *Id.*

The Government concedes that "some proponents of the 1929 UAA expressed overtly racist views." Opp'n at 4. Nonetheless, the Government argues that Mr. Patterson's proffered evidence does not prove that § 1326 has a disparate impact. *Id.* at 10–11. The Government also contends that racial discrimination was not a motivating factor in the enactment of § 1326 under *Arlington Heights*. According to the Government, the contemporary evidence cited by Mr. Patterson is either unreliable as an indicator of congressional intent or unrelated to § 1326. *See id.* at 12–13. The Government further argues that evidence related to the 1929 Act is of only "minimal value" in evaluating whether discriminatory motives infected the 1952 enactment of § 1326. *Id.* at 13–14.

6

Finally, the Government argues that even if the 1952 provision was infected by discriminatory motives, it was enacted for a legitimate purpose and would have been enacted regardless of any discriminatory motivations. *Id.* at 16.

The Court agrees with the Government, in part.

At the outset, the Court notes that Mr. Patterson's challenge to § 1326 is "one of many similar challenges that defendants have filed across the United States after a single ruling by a court sitting in the District of Nevada" that granted a similar motion to dismiss. *Maldonado-Guzman*, 2022 WL 2704036, at *2 (citing *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021)). Since the *Carrillo-Lopez* decision, dozens of other courts across the country have considered *Arlington Heights* challenges to § 1326, and each one of them has upheld the provision. *See United States v. Barcenas-Rumualdo*, 53 F.4th 859, 865 n.15 (5th Cir. 2022) (collecting cases). These include four district courts in this Circuit and two other circuit courts. *See Maldonado-Guzman*, 2022 WL 2704036; *United States v. Santos-Reynoso*, No. 21-cr-268 (LTS), 2022 WL 2274470 (S.D.N.Y. June 23, 2022); *United States v. Crespo-Castelan*, No. 22-cr-009 (JFK), 2022 WL 2237574 (S.D.N.Y. June 22, 2022); *United States v. Suquilanda*, No. 21-cr-263 (VM), 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021); *Barcenas-Rumualdo*, 53 F.4th 859; *United States v. Nunez-Hernandez*, 43 F.4th 857 (8th Cir. 2022). Recognizing the weight of this countervailing authority, courts in this Circuit have noted that *Carrillo-Lopez* is "somewhat of an outlier." *Suquilanda*, 2021 WL 4895956, at *5.

Turning to the *Arlington Heights* analysis, Mr. Patterson is correct that the 1929 UAA was motivated, at least in part, by a discriminatory purpose. As other courts have recognized, "the history of the 1929 enactment reflects a shameful chapter in America's past, one in which Congress considered 'The Eugenical Aspects of Deportation.'" *United States v. Calvillo-Diaz*,

7

No. 21-cr-445, 2022 WL 1607525, at *6 (N.D. Ill. May 20, 2022). Mr. Patterson's proffered evidence "shows that at least some members of Congress were motivated to criminalize reentry because of their support for eugenics and opposition to the increased presence of the 'Mexican race' in the United States." *United States v. Hernandez-Lopez*, 583 F. Supp. 3d 815, 820 (S.D. Tex. 2022).

Section 1326, however, was not enacted as part of the 1929 UAA. Thus, the Court must determine what effect the troubling racial history behind the enactment of the 1929 statute has on the subsequent enactment of the INA in 1952. Relying on *Ramos* and *Espinoza*, Mr. Patterson argues that reenactment does not "reset" legislative intent. Mot. at 22. He contends that the 1929 Act remains relevant in determining the constitutionality of § 1326 and that the provision's "'uncomfortable past' must still be '[e]xamined.'" *Id.* at 23–24 (alteration in original) (quoting *Espinoza*, 140 S. Ct. at 2273 (Alito, J., concurring)).[1]

The Supreme Court has held that "[t]he allocation of the burden of proof and the presumption of legislative good faith" that apply under *Arlington Heights* "are not changed by a finding of past discrimination." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). The Court has not clarified whether this rule continues to apply when "a law originally enacted with discriminatory intent is later reenacted by a different legislature." *Id.* at 2325; *see also id.* (noting that the Court in *Hunter v. Underwood*, 471 U.S. 222 (1985), "specifically declined to address the question

---

[1] Unlike other defendants who have challenged § 1326, Mr. Patterson does not appear to argue that the history of the 1929 Act is dispositive because Congress failed to repudiate the racially driven motives behind that enactment when it passed the INA in 1952. Nor could he. Even the district court in *Carrillo-Lopez* concluded that dicta from the Supreme Court in *Ramos* and *Espinoza* "was insufficient authority to justify relying solely on legislative history from the 1920s." 555 F. Supp. 3d at 1020 (citing *United States v. Medina Zepeda*, No. CR 20-0057 FMO, 2021 WL 4998418, at *3 (C.D. Cal. Jan. 5, 2021)). Courts in this Circuit have similarly recognized that while subsequent reenactments of a statute "do not entirely cleanse[] [the statute] of its original invidious purpose," the discriminatory motivations of a prior legislature are not "determinative of the outcome of an *Arlington Heights* analysis of a law enacted by a subsequent legislature." *Crespo-Castelan*, 2022 WL 2237574, at *3 (alterations in original) (internal quotation marks omitted).

8

whether the then-existing version [of a state constitutional provision] would have been valid if '[re]enacted today'" (second alteration in original)).

This case does not present the question left open by *Hunter* and *Abbott* because "there are 'key substantive differences' between the two statutes 'that establish that section 1326 is not a mere reenactment of the UAA.'" *Maldonado-Guzman*, 2022 WL 2704036, at *3 (quoting *United States v. Viveros-Chavez*, No. 21-cr-665, 2022 WL 2116598, at *5 (N.D. Ill. June 13, 2022)). The 1929 Act prohibited reentry only if a noncitizen had been "arrested and deported," 45 Stat. at 1551, while § 1326 also applies to noncitizens have been "excluded and deported," 66 Stat. at 229. The 1952 Act also broadened the scope of the 1929 Act, providing that a noncitizen is guilty if "at any time found in" the United States, not merely when he or she "enters or attempts to enter" the country. *Compare id. with* 45 Stat. at 1551. Finally, the 1952 Act provided an exception to criminal liability for a previously removed noncitizen who obtains the express consent of the Attorney General to reapply for admission. *See* 66 Stat. at 229.

While these changes did not radically alter the illegal reentry provision, they are sufficient under Second Circuit precedent to preserve the presumption of legislative good faith. In *Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010), the court held that the plaintiffs had not adequately alleged that a 1894 New York State constitutional provision was the product of intentional discrimination when they had pled sufficient facts "to plausibly show that the 1821, 1846, and 1874 enactments were motivated by a discriminatory purpose, but where they ha[d] not made any adequately supported factual allegations of impermissible motive affecting the delegates to the 1894 convention." 594 F.3d at 165. The Court relied on the fact that the challenged 1894 amendment to the constitutional provision made a "substantive" change: it required the legislature to maintain a felon disenfranchisement law permanently, while the prior

9

version of the provision required only that the legislature pass a felon disenfranchisement law at its next session. *See id.* at 167. The changes between § 1326 and the repealed UAA provision similarly qualify as substantive; therefore, the racially motivated history behind the 1929 statute does not create a presumption that the 1952 law was based on discriminatory motives. *See United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1074 (D. Or. 2021) ("[H]istorical background revealing past discrimination cannot alone 'flip[] the evidentiary burden on its head.'" (alteration in original) (quoting *Abbott*, 138 S. Ct. at 2325)).

Nonetheless, the UAA remains relevant as historical background to the 1952 statute. "The Supreme Court's decisions in *Ramos* and *Espinoza*, although rendered outside the context of an equal protection challenge, confirm this very point and 'support the contention that subsequent enactments of a statute do not erase its historical context.'" *Maldonado-Guzman*, 2022 WL 2704036, at *2 (quoting *Santos-Reynoso*, 2022 WL 2274470, at *3). Here, however, the Court agrees with the Government that the history of the UAA is of limited probative value in evaluating the constitutionality of § 1326. After twenty-three years had passed, "only thirty congressmen from the [1929] Congress remained in office in 1952." *Viveros-Chavez*, 2022 WL 2116598, at *8. Although the 1952 Congress did not address or actively repudiate the racist history behind the 1929 illegal reentry provision, the Court cannot "take Congress's silence about the history of the UAA as evidence that it adopted any prior discriminatory intent." *Barcenas-Rumualdo*, 53 F.4th at 866; *see also Calvillo-Diaz*, 2022 WL 1607525, at *10 ("[T]hat silence has no probative value for determining the intentions of a deliberative body like Congress.").[2]

---

[2] In fact, the congressional debate over the 1952 INA contained little discussion of the illegal reentry provision. *See United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the Immigration and Nationality Act of

Mr. Patterson also argues that contemporary evidence shows the discriminatory purpose underlying § 1326. He first cites a 1950 Senate Judiciary Committee Report that allegedly "endorsed the original 1929 Bill's effort to 'preserve the sociological and cultural balance of population in the United States.'" Mot. at 25 (citing S. Rep. 81-1515, at 455 (1950)). Other courts have recognized that many passages in the 1950 report "describe racist attitudes and detail the views of nativists who sought immigration policies that would promote white supremacy." *Calvillo-Diaz*, 2022 WL 1607525, at *8. These passages, however, focus on the quota system rather than the criminalization of unauthorized entry or reentry. *See id.* The passage quoted by Mr. Patterson, for example, comes in a discussion about the 1929 quota system's preference for immigrants from northern and western Europe over those from southern and eastern Europe.

Mr. Patterson also cites President Truman's veto message, which criticized the INA for being excessively punitive and perpetuating the racial and national discrimination evident in the 1929 legislation. *See* Mot. at 26–27. President Truman, however, was not a member of Congress. Moreover, "the Supreme Court has cautioned that statements by a bill's opponents are not probative of Congressional intent." *Crespo-Castelan*, 2022 WL 2237574, at *4 (citing *Bryan v. United States*, 524 U.S. 184, 196 (1998)). Thus, "President Truman's opinion on the INA is not probative of what Congress believed." *Barcenas-Rumualdo*, 53 F.4th at 867.

President Truman's criticism of the statute also had little to do with § 1326 itself. "[T]he veto statement was not specifically about § 1326 . . . but, rather, concerned the 'INA's continued use of the quotas that disfavored immigrants from Asia and southern and eastern Europe.'" *Maldonado-Guzman*, 2022 WL 2704036, at *4 (quoting *United States v. Salas-Silva*, No. 20-cr-

---

June 27, 1952, but ss 1325 and 1326 were not among the debated sections."). The lack of public debate over the illegal reentry provision is not particularly surprising because "it is plain that § 1326 is a necessary piece of the immigration-regulation framework." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998).

54 (RCJ) (CLB), 2022 WL 2119098, at *3 (D. Nev. June 13, 2022)). Although Mr. Patterson points out that President Truman criticized limitations on administrative discretion in deportation cases, even these comments have only an indirect connection to the illegal reentry provision.

Mr. Patterson next points to a letter written by Deputy Attorney General Peyton Ford, which used the racial slur "wetback"[3] and expressed support for the INA's addition of the clause providing that a previously removed noncitizen who was "found in" the United States was guilty of illegal reentry. *See* Mot. at 28.[4] Like President Truman, Deputy Attorney General Ford was not a member of Congress who debated or voted on the 1952 INA. Thus, without further evidence showing that his commentary had a substantial influence on the approval of § 1326, Deputy Attorney General Fords' views and motivations also carry little probative value in evaluating the constitutionality of § 1326. *See Crespo-Castelan*, 2022 WL 2237574, at *4 ("Like President Truman, Deputy Attorney General Ford was not a member of Congress and his memo 'give[s] no direct insight into the motivations of the 1952 Congress that passed the law.'" (alteration in original) (quoting *United States v. Muñoz-De La O*, 586 F. Supp. 3d 1032, 1048 (E.D. Wash. 2022))).

In addition to these statements, Mr. Patterson relies on Congress's passage in 1952 of Senate Bill 1815, which criminalized harboring unauthorized immigrants and was known as the "Wetback Bill." Mot. at 31–32; *see* Act of Mar. 20, 1952, 66 Stat. 26. "[T]he law is clear that the

---

[3] The Government has argued in other cases—although not in this one—"that 'wetback' was not a derogatory term when Congress used it in 1952 because it was an 'accurate description' of Mexican immigrants whose backs were wet from having illegally entered the United States by crossing the Rio Grande River." *Machic-Xiap*, 552 F. Supp. 3d at 1074. The Court notes that this argument is without merit. "[R]educing an entire population to a fleeting condition of a subset of that population is precisely what makes the term a slur." *Id.*

[4] Mr. Patterson claims that this change to the 1929 law, which he describes as "[t]he only substantive change," was requested by Deputy Attorney General Ford. Mot. at 28. Other courts have pointed out, however, "that Ford did not suggest this language; rather he "described and commented on Congress's addition of this language to the illegal reentry law." *Calvillo-Diaz*, 2022 WL 1607525, at *10.

12

mere use of racial slurs," while not dispositive of discriminatory intent, "*can* be evidence that official action was motivated by unlawful discriminatory purposes." *State v. U.S. Dep't of Com.*, 315 F. Supp. 3d 766, 810 (S.D.N.Y. 2018) (internal quotation marks omitted); *see also* Mot. at 29. Other courts have dismissed uses of this term in debates over S.B. 1851 as isolated incidents that cannot be attributed to the entire Congress. *See, e.g.*, *Barcenas-Rumualdo*, 53 F.4th at 867 ("The fact that individual lawmakers dubbed a bill something derogatory, without more, says nothing of the motivations of Congress 'as a whole' regarding the INA or § 1326 specifically."). Mr. Patterson, however, points out that "virtually every Senator who discussed S.B. 1851, at least on February 5, 1952, used the term 'wetback.'" Reply at 3 (citing 98 Cong. Rec. 971–813 (1952)); *see also Migratory Labor: Hearings Before the Subcomm. on Lab. & Labor-Mgmt. Rels. of the S. Comm. on Lab. and Pub. Welfare*, 82d Cong. 3, 70, 73, 228, 386 (1952).

Nonetheless, debates over S.B. 1851 provide only circumstantial evidence regarding Congress's motivations in enacting § 1326. Mr. Patterson argues that the statutes are related and that S.B. 1851 was split off from the rest of the INA only because "the specific need for action by the end of the season for Mexican labor contracts." Reply at 4. But even though § 1326 and S.B. 1851 address related subject matters and were debated in the same year, the legislative history of S.B. 1851 does not bear directly on the purpose underlying § 1326, just as debate over the quota system—which actually was included in the INA—does not directly reveal congressional motivations in enacting § 1326. *See Machic-Xiap*, 552 F. Supp. 3d at 1074, 1076 (concluding that the defendant had not proved that racial animus motivated the enactment of § 1326 even though he had demonstrated that "many congressmen casually used the racial epithet 'wetback' when the INA was being considered").

Mr. Patterson also contends that the structure of S.B. 1851 reveals Congress's discriminatory motivations. The anti-harboring provision contained an exception for employers of unauthorized immigrants. 66 Stat. at 26. Thus, according to Mr. Patterson, the purpose of S.B. 1851 was not to deter illegal immigration but to protect employers—and at the same time to marginalize Mexican workers and exclude them from full participation in American life. Mot. at 33. Mr. Patterson argues that the same motive may be imputed to § 1326. "But even if this anti-harboring provision represents a victory for employers over an overwhelmingly Latin American group of workers, that itself does not show discriminatory purpose." *Calvillo-Diaz*, 2022 WL 1607525, at *10. Mr. Patterson must still show "that one interest group's victory over another was the result of a racially discriminatory purpose." *Id.*

Finally, Mr. Patterson points to the general climate of white supremacy in the United States in 1952, which included widespread segregation in schools and public accommodation. Mot. at 34. While this cultural environment is a feature of the historical context of the INA, it does not provide direct evidence of discriminatory motivations in the enactment of § 1326. Nor does this context displace the ordinary presumption of legislative good faith.

In sum, Mr. Patterson has not established that racial animus was a motivating factor in the enactment of § 1326. The disturbing history of the 1929 UAA is relevant in evaluating the enactment of § 1326. Similarly, the repeated use of the term "wetback" in contemporary debates over S.B. 1851 suggests that racial animus may have been present in Congress at the time. But Mr. Patterson "fails to provide any direct evidence linking racial animus against [Latinos] to the enactment of Section 1326." *Santos-Reynoso*, 2022 WL 2274470, at *5. As discussed above, the statements from President Truman and Deputy Attorney General Ford are not evidence of Congress's motivations. And Congress's silence regarding the racially driven origins of the UAA

cannot make up this deficit. Accordingly, the Court "follows the reasoning of the vast majority of courts that have considered this evidence and concludes that it fails to establish that racial animus was a motivating factor behind the reenactment of § 1326." *Crespo-Castelan*, 2022 WL 2237574, at *3.

"This conclusion ends the constitutional inquiry." *Arlington Heights*, 429 U.S. at 271. Because Mr. Patterson has not proved that a discriminatory purpose was a motivating factor in the enactment of § 1326, the Court need not address the parties' arguments regarding disparate impact or legitimate nondiscriminatory purposes. *See id.* ("The court of Appeals' further finding that the Village's decision carried a discriminatory 'ultimate effect' is without independent constitutional significance."); *Maldonado-Guzman*, 2022 WL 2704036, at *5 ("Even assuming § 1326 has 'had a disparate impact on Mexicans and other Latinx peoples since its inception,' the Court finds that Maldonado's evidentiary proffer insufficient to establish under the *Arlington Heights* standard that discriminatory animus was a motivating factor in the enactment of the statute.").

Accordingly, the Court will deny Mr. Patterson's motion to dismiss. In doing so, the Court concludes that an evidentiary hearing is not necessary to resolve this motion, particularly because Mr. Patterson's evidentiary proffer relates primarily to the historical context in which the 1929 and 1952 statutes were enacted. *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998) ("An evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case, or when the disputed facts are amenable to complete resolution on a paper record." (citations omitted)); *Santos-Reynoso*, 2022 WL 2274470, at *6 ("Because the factual allegations upon which Defendant relies are

insufficient to show that the statute at issue is unconstitutional, the Court concludes such a hearing would be unnecessary.").

### IV. CONCLUSION

For the foregoing reasons, Mr. Patterson's motion to dismiss the indictment is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of January, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE