UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>GARFIELD PATTERSON. | No. 3:21-cr-103 (VAB) |

**RULING AND ORDER ON MOTION TO SUPPRESS**

Garfield Patterson is charged with reentry by a noncitizen who was previously removed from the United States, in violation of 8 U.S.C. § 1326. Indictment, ECF No. 1. On October 13, 2022, Mr. Patterson filed a motion to suppress statements he made to Middletown Police on April 16, 2019. Mot. to Suppress Statements, ECF No. 78 ("Mot."). Mr. Patterson argues that the police failed to provide the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966). Mot. at 3. He also contends that the police used a two-step interrogation process that violated Mr. Patterson's right to be free of coercive manipulation under *Missouri v. Seibert*, 542 U.S. 600 (2004). Mot. at 4–5.

On December 19, 2022, the Court held an evidentiary hearing and heard oral argument on the motion. Min Entry, ECF No. 97.

After the hearing, the parties submitted supplemental briefing on the motion to suppress. *See* Government's Suppl. Mem. in Opp'n to Def.'s Mot. to Suppress Statements, ECF No. 101 ("Gov't Suppl. Mem."); Def.'s Resp. to Government's Suppl. Mem. in Opp'n to Mot. to Suppress, ECF No. 105 ("Def. Suppl. Mem.").

For the following reasons, the motion to suppress is **DENIED**.

1

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

   A.  **Findings of Fact[1]**

At the time of the events at issue, Mr. Patterson was employed as a truck driver for USPack, a delivery company that contracts with the United States Postal Service. Tr. of Mot. Hr'g at 7, 13, ECF No. 100 ("Tr.").

On April 16, 2019, USPack's loss prevention director was investigating complaints of cell phones going missing from shipments handled by Mr. Patterson. Tr. at 9. After searching Mr. Patterson's truck, the loss prevention director found that cell phones were, in fact, missing. *Id.* He then confronted Mr. Patterson, who admitted to taking the cell phones. *Id.* at 9, 12. Mr. Patterson then wrote a confession and signed it. *Id.* at 12.

The loss prevention director then called Middletown Police. *Id.* at 8–9. After arriving at USPack's facility, Officer Jeffrey Scoppetto asked Mr. Patterson for identification. *Id.* at 17. Mr. Patterson first provided a USPack identification card that gave his name as Andrew Patters. *Id.*; Gov't Ex. 2. When asked for identification that contained his date of birth, Mr. Patterson provided a Connecticut identification card that listed a name with the initials M.D. Tr. at 18; Gov't Ex. 3.

Officer Scoppetto then asked Mr. Patterson if he would voluntarily go to the police station to provide a sworn written statement. Tr. at 20. Mr. Patterson was driven to the police station unhandcuffed in the back of Officer Scoppetto's marked police vehicle. *Id.* at 21. While putting Mr. Patterson in the vehicle, Officer Scoppetto informed Mr. Patterson that he was not under arrest. *Id.* at 25.

---

[1] Unless expressly stated otherwise, the Court makes the following findings based on the testimony of Middletown Police Officers Jeffrey Scoppetto and John Stroud, the testimony of Nadia Patterson, the exhibits admitted at the evidentiary hearing, and Mr. Patterson's affidavit, Patterson Aff., ECF No. 83.

At the police station, Mr. Patterson was taken to an interview room within the secured area of the station. *Id.* at 26. There, Officer Scoppetto typed Mr. Patterson's statement based on Mr. Patterson's responses to his questions, printed the statement out, and gave Mr. Patterson an opportunity to review it. *Id.* at 30; *see also* Gov't Ex. 5. Mr. Patterson signed the statement in a name with the initials M.D., which matched the driver's license he had presented. Tr. at 31; Gov't Ex. 5. Officer Scoppetto then asked Mr. Patterson for his age, which did not correspond to the date of birth he provided. Tr. at 37–38. Mr. Patterson also provided the wrong zip code for the address he provided. *Id.* Furthermore, Officer Scoppetto believed that the photograph on M.D.'s Connecticut identification card did not match Mr. Patterson. *Id.* at 38.

When the officers asked Mr. Patterson to clarify these discrepancies, Mr. Patterson admitted that he was using the driver's license of his brother, M.D. *Id.* at 38–39. He also admitted that he was a citizen of Jamaica and had been residing in the United States illegally for approximately fourteen years. *Id.* at 39.

At this point, Officer Scoppetto typed another statement and presented it to Mr. Patterson to review. *Id.* at 42–44; *see also* Gov't Ex. 6. Mr. Patterson signed this statement as well. Tr. at 46. As with the first sworn statement, the form upon which Officer Scoppetto typed Mr. Patterson's second statement includes the sentence, "I do hereby make the following statement of my own free will, without fear, threats or promises of any kind." Gov't Exs. 5, 6. The second document also states, "I lied about my name because I am an illegal citizen of the United States. I am a citizen of Jamaica. I am willing to fully cooperate." Gov't Ex. 6. After Mr. Patterson signed the statement, Officer Scoppetto told Mr. Patterson that he still was not under arrest. Tr. at 47.

3

Up to this point, the officers had not advised Mr. Patterson of his rights as set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966).[2]

Officer Scoppetto and Officer Stroud then escorted Mr. Patterson to the station's booking area, where Mr. Patterson was photographed and fingerprinted. Tr. at 48. Afterwards, Officer Scoppetto explained to Mr. Patterson that the officers would be applying for an arrest warrant for larceny and criminal impersonation. *Id.* at 50. Mr. Patterson was not arrested that day, and Officer Scoppetto drove Mr. Patterson back to his car at the USPack facility. *Id.* at 50–51, 151.

At some point on the afternoon of April 16, 2019, Mr. Patterson's wife, Nadia Patterson, received a telephone call from Mr. Patterson. Tr. at 155. Mr. Patterson told Ms. Patterson that he had been "arrested" or "held" and that he would be unable to pick up their daughter from school. *Id.*[3] The officers testified that they did not recall Mr. Patterson making a phone call while he was at the police station, but they did not deny that he may have made one. Tr. at 89–90, 114–15.

---

[2] The Government introduced at the hearing a signed departmental form stating that Mr. Patterson had been advised of his *Miranda* rights. *See* Government's Ex. 7; Tr. at 49–50. This form is kept in the station's booking area, but the officers could not recall when the form was completed or when Mr. Patterson was given *Miranda* warnings. *See* Tr. at 81–83. The Government does not assert that Mr. Patterson was given *Miranda* warnings before making the statements that he seeks to suppress. *See* Gov't Suppl. Mem. at 4–5. Thus, the Court finds that Mr. Patterson was not given *Miranda* warnings before signing the second written statement.

[3] Mr. Patterson states in his affidavit that he told the officers that he needed to leave to go pick up his daughter but that he did not feel free to refuse the officers' request to make a statement at the police station. Patterson Aff. ¶¶ 4–5.

The Court may consider Mr. Patterson's affidavit because, "[a]t a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz*, 447 U.S. 667, 679 (1980). When, however, a defendant chooses "not to testify at the evidentiary hearing, the assertions in his affirmation can neither be tested by cross-examination nor corroborated by the Court's observation of his demeanor." *United States v. Thompson*, 10-cr-94 (JSR), 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010). "[T]hough [the] defendant's decision not to testify may itself not be held against him, his hearsay assertions in his affidavit are not entitled to any weight unless received in evidence and, even then, may not be worth much in the absence of corroboration, whether from the defendant or otherwise." *Id.* Thus, Mr. Patterson's statements in his affidavit are entitled to little weight.

### B. Procedural History

On June 15, 2021, Mr. Patterson was indicted on one count of Reentry of a Removed Alien in violation of 8 U.S.C. § 1326(a) and 1326(b)(1). Indictment.

On September 7, 2021; October 4, 2021; February 17, 2022; April 13, 2022; and June 30, 2022, the Court granted motions to continue jury selection filed by Mr. Patterson. *See* ECF Nos. 26, 29, 34, 38, 44.

On October 13, 2022, Mr. Patterson filed a motion to suppress statements. Mot.

On October 14, 2022, the Court continued jury selection under 18 U.S.C. § 3161(h)(1)(D) in light of Mr. Patterson's pending motion to dismiss the indictment, motion to suppress, and the other pretrial motions filed by both parties. Order, ECF No. 80.

On November 4, 2022, the Government filed an opposition to Mr. Patterson's motion to suppress. Government's Mem. in Opp'n to Def.'s Mot. to Suppress Statements, ECF No. 87 ("Opp'n").

On November 11, 2022, Mr. Patterson filed a reply in support of his motion. Def.'s Resp. to Government's Suppression Mot. Opp'n, ECF No. 88 ("Reply").

On December 8, 2022, the Court continued jury selection under 18 U.S.C. § 3161(h)(1)(D) to provide additional time to address the motion to suppress. Order, ECF No. 92.

On December 19, 2022, the Court held an evidentiary hearing on the motion to suppress. Min. Entry, ECF No. 97.

On January 3, 2023, the Government filed a supplemental memorandum in opposition to the motion to suppress. Gov't Suppl. Mem.

On January 5, 2023, the Court continued jury selection under 18 U.S.C. § 3161(h)(1)(D) and (h)(7)(A) to ensure effective preparation for trial and to address pending motions. Order, ECF No. 104.

On January 10, 2023, Mr. Patterson filed a supplemental memorandum in support of his motion to suppress. Def. Suppl. Mem.

## II.     STANDARD OF REVIEW

When an individual is questioned in police custody, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. "Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of his or her rights." *United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016).

Before trial, a criminal defendant may move to suppress evidence that was obtained illegally, including statements elicited in violation of *Miranda*. *See* Fed. R. Crim. P. 12(b)(3)(C). On a motion to suppress, the government bears the burden of proving by a preponderance of the evidence that the defendant's statement is admissible. *See Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004) (plurality opinion).

## III.    DISCUSSION

Mr. Patterson argues that his statements should be suppressed both because they were made during a custodial interrogation and because they were not voluntary.

The Court will address each issue in turn.

### A. Custodial Interrogation

As noted above, *Miranda* warnings are required only when a suspect is subject to interrogation while in police custody. There is no dispute that Mr. Patterson was not given *Miranda* warnings before he made the challenged statements. Mr. Patterson's questioning also constituted an interrogation because the officers "expressly questioned" Mr. Patterson about "potentially incriminating activities." *Faux*, 828 F.3d at 134–35. Thus, the only contested issue is whether Mr. Patterson was in custody at the time he was questioned.

In the Second Circuit, "[t]he test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *Id.* at 135 (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)).

In evaluating whether this second condition is met, the Court must consider a variety of factors, including

> (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion.

*Id.* at 135 (internal quotation marks omitted).

In the memorandum accompanying his motion, Mr. Patterson does not address directly the factors outlined in *Faux*. Instead, he argues primarily that the Middletown Police engaged in

7

an impermissible two-stage interrogation designed to circumvent *Miranda*. *See* Mot. at 4–5. In *Seibert*, the Supreme Court excluded statements obtained through "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession." 542 U.S. at 604 (plurality opinion). The Second Circuit has since held that *Seibert* applies only when "a deliberate, two-step strategy was used to obtain the postwarning confession." *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012). The Government bears the burden of proving that it did not employ such a strategy. *Id.*

Mr. Patterson contends that, as in *Seibert*, the procedure employed here enables one questioner to effectively coerce a confession, which primes the defendant to repeat the confession when questioned by the police. *See id.* at 5. Mr. Patterson acknowledges that this case is factually distinguishable from *Seibert* because the loss prevention director who conducted the first questioning was not a police officer. *See id.* at 5. Nonetheless, he argues that the Court can apply the logic of that decision here, particularly because there may have been close coordination between the police and Mr. Patterson's employer. *See* Reply at 1–3.

In his supplemental memorandum, Mr. Patterson argues that he was in custody under the framework set forth in *Faux*. Def. Suppl. Mem. at 5. He argues that the location of the interrogation indicates he was in custody because he was taken through a locked door to the secured area of the police station. *Id.* Mr. Patterson also urges the Court to consider that the police were not being truthful to him about whether he was free to leave. *Id.*

The Government, meanwhile, argues that consideration of the *Faux* factors shows that Mr. Patterson was not in custody when he was questioned by the police. *See* Opp'n at 6. It emphasizes that the interview was relatively brief, that Mr. Patterson voluntarily agreed to be interviewed, that he was not handcuffed or otherwise restrained, that no weapons were drawn,

8

and that Mr. Patterson was repeatedly told that he was not under arrest and free to leave. *See id.* at 6–9; Gov't Suppl. Mem. at 5–8. The Government also argues that the Court should consider Mr. Patterson's background and experience, particularly the fact that he had previously been given *Miranda* warnings in the past. *See* Opp'n at 9–10.

In response to Mr. Patterson's *Seibert* argument, the Government points out that the loss prevention director was not a law enforcement official. *See id.* at 10. It also argues that there is no evidence suggesting that the loss prevention director interviewed Mr. Patterson at the behest of law enforcement. *See id.*

The Court agrees with the Government.

The Court need not consider whether a two-stage interrogation involving private security personnel can violate *Seibert* because this case differs from *Seibert* in a more fundamental way. In *Seibert*, the impermissible goal of the two-stage interrogation process was to "render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." 542 U.S. at 611. The two-stage procedure sought to sanitize a confession obtained through a prewarning custodial interrogation with a postwarning confession. Here, however, Mr. Patterson did not receive *Miranda* warnings at either questioning. Thus, the two-stage procedure that Mr. Patterson alleges does not raise the same concern the Court highlighted in *Seibert*. The purpose of the alleged coordination between the police and Mr. Patterson's employer could not have been to undermine the effect of *Miranda* warnings if none were ever provided.

Furthermore, the admissions related to Mr. Patterson's immigration status that are at issue in this prosecution were made only during the second questioning conducted by the police. The Supreme Court indicated in *Seibert* that "the overlapping content of the two statements" is

9

relevant in determining whether a two-stage interrogation was impermissible. *Id.* at 615. Here, at least with respect to the immigration-related statements, the second questioners did not merely "lead him over the same ground again." *Id.* at 613. This difference also diminishes the risks that the Court highlighted in *Seibert*.

Because Mr. Patterson never received *Miranda* warnings, *Seibert* does not apply, and the Court instead must determine whether *Miranda* warnings were required at all. But in evaluating whether Mr. Patterson was in custody, the Court will consider *Seibert*'s principle that law enforcement cannot use deliberate interrogation strategies to circumvent *Miranda*.

Turning to the factors laid out in *Faux*, the Court first considers the duration and the location of the interrogation. Mr. Patterson's encounter with the police lasted approximately three hours. Tr. at 87. While this duration was not brief, courts in this Circuit have found that even much longer questionings were not custodial. *See, e.g.*, *United States v. Saab*, No. 19 CR. 676 (PGG), 2021 WL 5868157, at *9 (S.D.N.Y. Dec. 10, 2021) (concluding that an eight-and-a-half hour interview was not custodial when officers encountered the defendant in a public place, asked them to accompany him to an office building across the street, and told him that he was not under arrest); *see also United States v. Clark*, No. 1:19-cr-00155 (EAW), 600 F. Supp. 3d 251, 267–68 (W.D.N.Y. Apr. 25, 2022) (finding that a two-hour interview at a police station was not custodial).

The location, an interview room at the police station, weighs in favor of suppressing the statements. Nonetheless, the Supreme Court has held that *Miranda* warnings are not required "simply because the questioning takes place in the station house." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam); *see also Clark*, 600 F. Supp. 3d at 267 ("The fact that an

10

interview takes place at a police station does not, standing alone, demonstrate that an individual is 'in custody.'").

The third *Faux* factor, whether the suspect volunteered for the interview, favors the Government. According to Officer Scoppetto, Mr. Patterson voluntarily agreed to go with the officers from the USPack facility to the police station. Tr. at 22. Although Mr. Patterson states that he told the officers he had to pick up his daughter and did not feel free to leave, the Court places greater weight on the testimony of Officer Scoppetto and Mr. Patterson's sworn statement than on the affidavit he submitted in support of this motion. *Compare* Tr. at 22, *and* Gov't Ex. 6, *with* Patterson Aff. ¶¶ 4–5.

The fourth and fifth factors also favor admission of the statements. There is no evidence indicating that the officers restrained Mr. Patterson or that they drew their weapons. *See* Tr. at 21, 115. At the police station, Mr. Patterson used the bathroom on his own before proceeding to the interview room with Officer Scoppetto. *See* Tr. at 25–26.

The final factor, whether officers advised the suspect that he was free to leave, narrowly favors the Government. "Such advice, while not dispositive, is probative in 'assessing the extent to which a reasonable person would understand any restraints on his freedom.'" *United States v. Familetti*, 878 F.3d 53, 60 (2d Cir. 2017) (quoting *Newton*, 369 F.3d at 676); *see also United States v. Butt*, No. 18-CR-00087 (NSR), 2019 WL 479117, at *16 (S.D.N.Y. Feb. 7, 2019) (collecting cases and noting that the Second Circuit's evaluation of custody relies significantly on whether the defendant was told that he or she was not under arrest and was free to leave).

Both at USPack and later at the police station, Officer Scoppetto informed Mr. Patterson that he was not under arrest. Tr. at 25, 47. Mr. Patterson also stated in his second sworn

statement, "I am aware I was free to leave, but I wanted to be honest with police about the incident." Gov't Ex. 6.

Neither of the police officers, however, testified that they told Mr. Patterson he was free to leave. *See* Tr. at 51, 151. And in fact, Officer Stroud admitted that they probably could not have permitted Mr. Patterson to leave, at least until they identified him. *See id.* at 142, 151. Even if the officers never expressly told Mr. Patterson that he was not free to leave, a reasonable person in Mr. Patterson's situation might have suspected that they would have detained him if he had attempted to leave. *See Stansbury v. California*, 511 U.S. 318, 325 (1994) (noting that an officer's subjective beliefs are "to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action'").

In addition to the factors outlined in *Faux*, the Court will consider the impact of the initial questioning and confession at USPack. Although, this confession could not have impacted the efficacy of *Miranda* warnings that were never provided, it could have affected the "ultimate inquiry" in this case, "whether a reasonable person would have understood the law enforcement agents' restraint on his freedom to equal 'the degree associated with a formal arrest.'" *United States v. Schaffer*, 851 F.3d 166, 173 (2d Cir. 2017) (quoting *Newton*, 369 F.3d at 670). The fact that Mr. Patterson had already confessed and that the police were in possession of this confession would make a reasonable person more likely to believe he or she was in custody when an officer asked him or her to come to the police station.

Nonetheless, the Court finds that the factors favoring the Government outweigh the factors favoring Mr. Patterson. The Government's evidence shows that Mr. Patterson voluntarily came to the police station and was informed that he was not under arrest. The evidence does

suggest possible efforts to avoid triggering *Miranda* warnings. Still, the evidence does not reach the high threshold required by the Second Circuit to show that Mr. Patterson's freedom of action was "curtailed to a degree associated with formal arrest." *Faux*, 828 F.3d at 135.

This case is similar to those in which the Second Circuit has concluded that the defendant was not in custody. In *United States v. Familetti*, 878 F.3d 53 (2d Cir. 2017), the defendant argued that he was effectively in custody even though he had been told that he was free to leave. Like Mr. Patterson, the defendant relied on subsequent testimony from an FBI agent that, if the defendant had tried to leave, the agent would have had to "consider his options." *Id.* at 60. Nonetheless, the court concluded that the defendant was not restrained to an extent that was equivalent to formal arrest, in part because there was "no evidence that Familetti ever asked or tried to leave the interview." *Id.* at 62–63. Although the defendant in *Familetti* was questioned in his home rather than in a police station, he had also been physically restrained while agents swarmed his apartment. *Id.* at 61.

In *Faux* itself, the defendant was interviewed while officers swarmed about her home, and, as in this case, the defendant was not specifically told that she was free to leave. 828 F.3d at 134. Nonetheless, the Second Circuit concluded that the defendant was not in custody, emphasizing that was informed she was not under arrest and "was never told that she was *not* free to leave." *Id.* at 139. The defendant in *Faux* "was not handcuffed during the interrogation and was not arrested at its conclusion." *Id.* at 138. The Court also noted that "she did not seek to end the encounter . . . ; the tone of the questioning was largely conversational; there is no indication that the agents raised their voices, showed firearms, or made threats"; and that "[h]er movements were monitored but not restricted." *Id.* Each of those factors is present in Mr. Patterson's case as well.

13

In light of the Second Circuit's holdings in *Familetti* and *Faux* and their similarities to this case, the Court cannot conclude that Mr. Patterson's situation was "comparable to formal arrest." *Faux*, 828 F.3d at 135.

Accordingly, Mr. Patterson's interrogation by police on April 16, 2019, was not custodial, and *Miranda* warnings were not required.

### B. Voluntary Statements

"When, as here, a defendant seeks to suppress non-custodial statements made to law enforcement authorities, the single issue before the court is whether the statements were voluntary, *i.e.*, the 'product of an essentially free and unconstrained choice by [their] maker,' or coerced by police activity in violation of constitutional rights not to incriminate oneself and due process." *United States v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018) (alteration in original) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). Police conduct must be "coercive" to render a defendant's statements involuntary. *Id.* On the other hand, police conduct that is merely "false, misleading, or intended to trick and cajole the defendant into confessing" does not necessarily make a defendant's confession involuntary. *Id.* (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

To determine that Mr. Patterson's confession was involuntary, the Court must make "specific findings . . . that under the totality circumstances . . . the defendant's will was overborne by the [police] conduct." *Id.* (alteration in original) (quoting *Anderson*, 929 F.2d at 99). Circumstances that the Court should consider "generally fall into 'three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.'" *Id.* (quoting *Green v. Scully*, 850 F.2d 894, 901–02 (2d Cir. 1988)).

Mr. Patterson appears to argue that the conduct of the USPack security personnel, which was allegedly coordinated with the Middletown Police, was coercive and overcame Mr. Patterson's will. He points out that many workers, particularly those who are not legally authorized to work in the United States, are "beholden to the commands of their bosses." Mot. at 4. Thus, he argues, USPack was able to coerce his confession, which they then turned over to the police. Although the purportedly coercive conduct was undertaken by private individuals, Mr. Patterson argues that "questioning by non-Police parties acting in concert with police" may implicate a Defendant's Fifth Amendment and Fourteenth Amendment rights. Reply at 2.

The Government does not address this strand of Mr. Patterson's argument directly, although it notes that Mr. Patterson's criminal history makes it less likely that he would be unaware of his rights. Opp'n at 9. The Government also argues that "there is nothing to remotely suggest that the loss prevention officer interviewed Mr. Patterson at the behest of law enforcement." *Id.* at 10.

The Court disagrees with Mr. Patterson.

Mr. Patterson's theory of police coercion requires a degree of close coordination between the police and the loss prevention officers. If, for example, the police had directed USPack's loss prevention director to question Mr. Patterson under threat of termination from his job in order to elicit a confession, the Court would have serious concerns about the voluntariness of Mr. Patterson's statements. The police could not themselves threaten Mr. Patterson with the loss of his job, and coordinating with private individuals to obtain a confession through such a threat could amount to the type of compelling influence that renders a confession involuntary. *Cf. Arizona v. Mauro*, 481 U.S. 520, 529 (1987) ("Any statement given freely and voluntarily

without any compelling influences is, of course, admissible in evidence." (quoting *Miranda*, 384 U.S. at 478)).

The evidence here, however, does not show this type of coordination. After eliciting Mr. Patterson's confession—on a matter unrelated to the offense alleged here—the loss prevention director called the police and informed them of Mr. Patterson's statements. Officer Scoppetto also testified that he received the written confession obtained by the loss prevention director only after arriving at USPack. Tr. at 54. None of the evidence put forth at the hearing suggests that the police coordinated with USPack in any significant way to elicit a confession from Mr. Patterson.

Accordingly, the Court concludes that Mr. Patterson's statements to the police were voluntary.

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that Mr. Patterson's statements to Middletown Police officers on April 16, 2019, were non-custodial, and, therefore, that *Miranda* warnings were not required. The Court also concludes that Mr. Patterson's statements were made voluntarily.

Accordingly, the Court concludes that Mr. Patterson's statements are admissible, and Mr. Patterson's motion to suppress is **DENIED**.

**SO ORDERED** at Bridgeport, Connecticut, this 20th day of January, 2023.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE